UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CASE NO. 05-CR-22-KKC

UNITED STATES OF AMERICA,                              PLAINTIFF

VS.                     **REPORT AND RECOMMENDATION**

DALLAS KIRBY                                           DEFENDANT

*******

This matter is before the Court upon the "Motion to Suppress Evidence" (DE#17) by the defendant, Dallas Kirby. An evidentiary hearing was held on April 28, 2005, with the defendant personally present and represented by counsel. See DE#26, Transcript. Due to the unavailability of a material witness, a further hearing was held on May 18, 2005. See DE#29, Transcript.  Having carefully considered the record, including the motion (DE#17), response (DE#19), supplemental brief by defendant (DE#30), supplemental brief by the United States (DE#31), and the hearing testimony and exhibits (DE#28), the Magistrate Judge recommends the following proposed findings of fact and conclusions of law:

**I.  Facts and Procedural History**

On August 19, 2004, law enforcement officers with the Kentucky Governor's Marijuana Eradication Task Force flew in a helicopter over a quadrant in Rockcastle County, Kentucky for the purpose of looking for (and eradicating) marijuana plants. The helicopter was flying at an estimated altitude of 600 feet. DE#26, TR 6.  KSP Detective John Pratt was on special detail in the helicopter as the designated "spotter". DE#26, TR 5. In route to the intended quadrant, KSP "repel master" Jon Couch  initially observed some suspected marijuana plants growing in a rural area off Highway 618, and the helicopter circled down in altitude for the officers to take closer look. DE#26, TR 7. After their suspicions were confirmed, the officers landed the helicopter in a field across the road from the residence. DE#26, TR 18.

The officers, including Detective Pratt and Deputy United States Marshal Mike Walters, went up the driveway and approached the front door of the Kirby residence. Detective Pratt knocked, but no one answered. DE#26, TR 19, 37, 54-55. The officers did not cross any barriers, such as fences or gates, and did not observe any 'no trespassing' signs. DE#26, TR 10, 39-40; DE#29, TR 16. The officers did not search the residence at this time. The officers proceeded through the backyard area toward the suspected marijuana plot and went past chicken coops (barrels) with fighting roosters, various smaller storage outbuildings, a "lot of old junked cars", and several dogs that were chained to doghouses. DE#26, TR 11, 18, 37, 44. The officers proceeded to the marijuana they had observed growing by a utility pole.

The officers identified nineteen marijuana plants (8-10 feet tall) in each of the two plots. DE#26, TR 30, 48. Both plots were located approximately 50 yards behind the Kirby residence.[1] One plot was in a circle around a utility pole, partially obscured by high weeds. DE#26, TR 7, 48-49. The other plot was near foliage in a fence row on the boundary line between the Kirby property and the next door neighbor. DE#26, TR 23, 31, 49; DE#29, TR 5, 18. The marijuana plots and Kirby residence were not enclosed together by a fence, although there was a fence row that separated Kirby's backyard from his next-door neighbor.[2] DE#26, TR 23. The officers called for back-up in case there was an arrest[3] and began eradicating the marijuana plants.

At the site of the marijuana plot observed from the air, the officers observed and cut eighteen (18) mature marijuana plants, being eight to ten feet high. This plot (identified on the photographs as "plot #1") was near a utility pole and encircled by tall weeds, with a small entry break. Later, after Dallas Kirby arrived on the scene and accompanied DEA Agent Gray to that plot, Kirby stated "Well, there's another one right there." It was a plant the officers had "missed". It was then cut, making the total nineteen (19) plants in plot #1.

Other officers located plot #2, on the right side behind the residence, near

---

[1] On cross-examination, defense counsel elicited testimony indicating that the distance, initially estimated at 50 yards, may have been closer to 110 feet (roughly 35 yards). DE#26, TR 19.

[2] Several photographs of the premises were introduced into evidence at the suppression hearing.

[3] KSP Detective Pratt indicated that if they arrested a suspect, they would have to transport the suspect to the local jail by vehicle, rather than by helicopter. DE#26, TR 12.

and just across a fence. The fence was variously described as "a property line fence", "a pasture fence", and an "old barbed wire fence". The officer who located this plot stated he "could see marijuana sticking above other foliage", which he described as "horse weeds", four to five feet in height. This plot also contained nineteen (19) marijuana plants, which the officers eradicated.

  KSP Trooper Billy Sumner walked toward a neighboring residence to find out what road they were on, when a car approached. He flagged it down to ask the driver, who turned out to be Matthew Kirby. When Trooper Sumner asked Matthew Kirby who lived there, he indicated Dallas Kirby (his father). DE#26, TR13, 41. Dallas Kirby subsequently drove up to the residence while the officers were still present. Detective Pratt spoke with him in the front yard and asked for consent to search the residence. DE#26, TR13. Dallas Kirby had not been arrested at this time and was not hand-cuffed. He stood in the front yard and talked with Detective Pratt, who explained that the officers "had issues with some illegal marijuana...within the curtilage of the house or in the home." DE#26, TR 27, 29. Detective Pratt explained to Dallas Kirby the parameters that the officers wanted to search. DE#26, TR 31. Dallas Kirby indicated he had only lived there for about a month. DE#29, TR 14. He told the officers that his brother had lived there before him. The officers verified that the mail in the mailbox had defendant's name on it. DE#29, TR 14. Detective Pratt read the consent form to Dallas Kirby, who indicated he had no questions and then signed it. DE#29, TR 5. Agent Gray and Detective Pratt both witnessed him sign the consent form. See DE#26, TR 13, 24; DE#29, TR 5; DE#19, attached exhibit; and see, Gov. Hearing Exh. 1. Defendant made no statements to Detective Pratt at this time regarding the marijuana and indicated he had no questions about the consent to search form. See DE#26, TR 15.

  The consent form indicated that place to be searched was "Route 4, Box 308, Mount Vernon, Kentucky" which was the address for that residence, as provided by Dallas Kirby. DE#23, TR 25. The consent form did not specifically mention any automobiles. DE#23, TR 26. During the subsequent search of the residence, officers found suspected methamphetamine powder in two bedrooms, as well as marijuana, a triple beam scale, and a large amount of U.S. currency. DE#29, TR 6. Dallas Kirby denied any knowledge of the powder. DE#29, TR 6. Lab testing later confirmed that the powder was methamphetamine. Kirby told the officers he knew who owned the marijuana located inside the residence, but declined to state the owner's name.

  During the search of the residence, Agent Gray went outside to the pick-up truck (driven by defendant) in order to identify "who it belonged to". When he

looked through the window glass for the vehicle's VIN number, he observed a .38 Smith & Wesson pistol on the floorboard, partially protruding from underneath the front seat. DE#29, TR 7, 15-16. Agent Gray had earlier been informed by Deputy Marshal Walters that Dallas Kirby was a convicted felon who had recently completed a term of supervised release. DE#29, TR 14. Agent Gray then seized the firearm from inside the vehicle.

## II. Issues Presented

In his motion, Dallas Kirby argues that the evidence seized from the premises and vehicle should be suppressed because: 1) law enforcement officers conducted a warrantless search of his outdoor premises ("curtilage") in violation of the Fourth Amendment, and 2) his consent to search the residence was invalid. At the hearing, counsel specified that he was "moving to suppress everything that occurred there as a result of the search, including the search of the car [that Dallas Kirby had arrived in]..., the search in the house, and the search of the curtilage." DE#26, TR 3. In his supplemental motion, he further argued that Dallas Kirby had standing to challenge the search of his residence, that the agent did not view the gun in the vehicle from a place where the agent had a right to be, that the marijuana plants were within the curtilage of the residence, and that the items seized from within the home are "fruits of the poisonous tree" due to the allegedly unlawful warrantless "search" of the curtilage.

## III. Conclusions of Law

**Fourth Amendment**

A person's right to be free from unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution, which provides:

> "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Warrantless searches are generally "unreasonable" under the Fourth Amendment. See Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967); United States v. Williams, F.3d, 2003 WL 22052306, *4 (6th Cir. 2003). However, there are several judicially recognized exceptions to the warrant requirement, including consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); and see, e.g., United States v. Hudson, – F.3d –, 2005 WL 926967, *12 (6th Cir. (Tenn.))("An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996).

**Whether the Helicopter Flyover, Approach of the Residence, and Subsequent Eradication of the Outdoor Marijuana Plants Amounted to a "Warrantless Search" in Violation of the Fourth Amendment**

Defendant correctly argues the general proposition that warrantless searches are presumptively unreasonable, citing the United States Supreme Court's decision in Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (holding that the Fourth Amendment requires police to obtain a search warrant based upon a judicial determination of probable cause prior to entering a home).

However, Supreme Court precedent indicates that an aerial flyover by law enforcement officers and their observation of marijuana plants growing in the open upon a defendant's real property does not constitute an "unreasonable search" for purposes of the Fourth Amendment. In Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693, 694 (1989), the Supreme Court held that aerial observation by officers from a helicopter approximately 400 feet above a defendant's greenhouse in his backyard did not constitute a "search" and did not violate the Fourth Amendment. Id. at 445. The Supreme Court in *Riley* observed "that the Fourth Amendment does not require the police traveling in the public airways at an altitude of 400 feet to obtain a warrant in order to observe what is visible to the naked eye." Id. at 445. The Supreme Court explained that:

> "As a general proposition, the police may see what may be seen "from a public vantage point where [they have] a right to be," 476 U.S., at 213, 106 S.Ct., at 1812. Thus the police.....were.... free to inspect the yard from the vantage point of an aircraft flying in the navigable airspace as this plane was. "In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants

5

were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye." *Id.,* at 215, 106 S.Ct., at 1813-1814. We arrive at the same conclusion in the present case. In this case, as in *Ciraolo*, the property surveyed was within the curtilage of respondent's home." Riley, 488 U.S. 445, 450, 109 S.Ct. 693, 696-697 (1989).

The Supreme Court observed that private and commercial flight in the public airways is routine in the United States and that "Riley could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter." Riley, 488 U.S. at 450-451, 109 S.Ct. at 697, citing *Ciraolo,* 476 U.S. at 215, 106 S.Ct. at 1813. Justice O'Connor succinctly observed in her concurring opinion in *Riley*, 488 U.S. at 454, that "If the public can generally be expected to travel over residential backyards at an altitude of 400 feet, Riley cannot reasonably expect his curtilage to be free from such aerial observation." Similarly, in California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210, the Supreme Court held that a "naked-eye" police observation of the backyard of a house during a fly-over was not a "search".[4] Hence, the helicopter flyover in the present case did not amount to an impermissible warrantless "search".

After the officers observed the suspected marijuana plants growing in the "open" (plainly visible from airspace), they landed the helicopter nearby and approached the Kirby residence. The officers did not violate the Fourth Amendment by approaching the residence and knocking on the door. Law enforcement officers are permitted to approach a suspect's home to speak with him. See United States v. Saari, 272 F.3d 804, 811 (6th Cir. 2001); Alvarez v. Montgomery County, 147 F.3d 354, 358 (4th Cir.1998); United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).

The remaining allegation to be considered is whether the officers then

---

[4] A routine day-time helicopter overflight in navigable airspace where officers use their own eyesight to observe plants growing in an open field is quite different from hovering over a home and using a thermal imaging device ("FLIR") at night to detect heat emissions from such home. See Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038 (2001)(holding that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area ... constitutes a search ....").

6

violated defendant's Fourth Amendment rights by proceeding across the property to eradicate the marijuana growing in two plots located approximately 35-50 yards behind defendant's home. Defendant argues that the officers should have obtained a search warrant before entering upon his premises without permission. He argues that the marijuana plots were within the curtilage of his residence and that the officers conducted a warrantless "search" of the curtilage of his property.

The curtilage is considered an extension of the residence for purposes of the Fourth Amendment when determining the proper scope of a search pursuant to a search warrant. See United States v. Jenkins, 124 F.3d 768, 773 (6th Cir. 1997); United States v. Dunn, 480 U.S. 294, 301 (1987). The United States Supreme Court observed in Dow Chemical Co. v. United States, 749 F.2d 307 (6th Cir. 1984), aff'd, 476 U.S. 227 (1986) that:

> "...the backyard and area immediately surrounding the home are really extensions of the dwelling itself.  This is not true simply in a mechanical sense because the areas are geographically proximate.  It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house."

However, the concept of "curtilage" is usually discussed in the context of the scope of a search pursuant to a search warrant, rather than whether an alleged warrantless "trespass" onto the curtilage amounts to a search itself.  See, e.g., United States v. Wolfe, 234 F.3d 1271, 2000 WL 1562833 (6th Cir. (Mich.)) ("recent cases in this circuit and elsewhere clearly hold that a warrant for the search of a specified residence or premises authorizes the search of auxiliary and outbuildings within the curtilage.... without any additional requirement of either probable cause as to the specific building, or specific identification of the building"), citing United States v. Watkins, 179 F.3d 489, 505 (6th Cir. 1999).

The United States Supreme Court's precedent regarding "open fields" controls this analysis. Although the defendant argues that the officers violated his Fourth Amendment right against "unreasonable searches" by entering upon the curtilage of his property without a search warrant, the United States Supreme Court has indicated that the common law of trespass does not control for purposes of Fourth Amendment analysis. See Oliver v. United States, 466 U.S. 170, 183, 104 S.Ct. 1735, 1744, 80 L.Ed.2d 214 (1984)("Nor is the government's intrusion upon an open field a 'search' in the constitutional sense because that intrusion is a trespass at common law"). The Supreme Court held that a defendant has no legitimate expectation of privacy in an "open field", as that term is understood in

Supreme Court precedent. Oliver, 466 U.S. at 178, 104 S.Ct. 1741. In *Oliver*, the Supreme Court explained that:

> "There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas. And both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air. For these reasons, the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable'." Oliver, 466 U.S. at 179, 104 S.Ct. at 1741 - 1742.

The United States correctly asserts that the marijuana was observed in "open fields" that were not fenced or otherwise hidden from view.

The United States further contends that the marijuana plots were *not* actually within the curtilage of the Kirby residence. There is nothing in the record, other than the general proximity of the marijuana plants approximately 35-50 yards away, to indicate any connection with the residence. See United States v. Dunn, 480 U.S. 294, 301 (1987)(discussing factors to consider when determining the curtilage of a residence). Although the marijuana plots were apparently on the premises owned by Kirby, the marijuana plots cannot fairly be said to have been in the "immediate" area around the house. See Oliver, 466 U.S. at 178, 104 S.Ct. at 1741 ("we reaffirm today...that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home").

Detective Pratt indicated that it appeared to him that everything between the fence row and a farm pathway on the other side was being taken care of and the animals being fed. He assumed that this area was all Kirby's property and referred to it as "curtilage". DE#26, TR 33-34. Defense counsel argued that there is no way to tell where the back yard (curtilage) actually ends because "you can't tell any difference, there is no line, there is no mark, there is no fence, there is absolutely no mark of any kind from the back door to that power pole where that marijuana plant was found..." DE#26, TR 46. However, U.S. Marshal Mike Walters testified that it appeared to him that the marijuana plots were located outside the yard area for Kirby's residence. DE#26, TR 40, 45. He testified that the grass in the area around the residence was shorter than the grass farther away by the marijuana

8

plots. DE#26, TR 50. The exhibits and testimony also indicated that the marijuana plots were located past the area where the farm animals (chickens) were kept, which tends to suggest that the plots were not in the immediate area around the house and would not concern any "private experiences of home life".

The circumstances in the present case indicate that defendant Kirby did not exhibit an actual expectation of privacy in the marijuana plots, i.e. he did not conceal the marijuana by covering it or otherwise shielding it from view, and in any event, he had no legitimate expectation of privacy in marijuana plants growing in "open fields". Any subjective expectation of privacy he may have had in outdoor marijuana plots is not one that "society is prepared to accept as reasonable" under the circumstances. See Oliver, 466 U.S. at 179, 104 S.Ct. at 1741-1742. Given the application of "open fields" precedent here, the defendant's further argument regarding "fruits of the poisonous tree" is not applicable.

**Consent to Search Residence**

Dallas Kirby next challenges the search of his residence by claiming that his consent was invalid. However, the evidence of record reflects that Dallas Kirby voluntarily consented to the search of his residence. Law enforcement officers may conduct a search without a warrant if a person with a legitimate privacy interest in the place to be searched voluntarily consents to the search. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); United States v. Dede, 83 Fed. Appx. 732 (6th Cir. (Ohio))(a "consensual encounter ... implicates no Fourth Amendment interest"), citing Florida v. Rodriguez, 469 U.S. 1, 5-6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). "The prohibition [against warrantless searches] does not apply ....to situations, in which voluntary consent has been obtained, either from the individual whose property is searched ... or from a third party who possesses common authority over the premises." Rodriguez, 497 U.S. at 181, 110 S.Ct. 2793. Given that Dallas Kirby had owned the house and was receiving mail there, and given that he and his son had both indicated to police that he lived there, defendant presumably has a legitimate privacy interest in such residence.

When defendant Kirby arrived at his residence, the officers spoke with him and asked for his consent to search inside the residence. In United States v. Carter, 378 F.3d 584 (6th Cir. 2004), the Sixth Circuit Court of Appeals observed that "[i]t is well-settled that a person may waive his Fourth Amendment rights by consenting to a search", citing Davis v. United States, 328 U.S. 582, 593-94 (1946). The fact

9

that the police were in defendant's front yard does not invalidate the consent, as law enforcement officers may approach a suspect's home to speak with an individual. See United States v. Saari, 272 F.3d 804, 811 (6th Cir. 2001). Kirby and Detective Pratt spoke in an ordinary conversational tone in a business-like manner, with no yelling, impermissible physical coercion, or other intimidation. No weapons were drawn. Kirby was not hand-cuffed, nor had he been arrested at the time. The form was read to defendant prior to his signing. The defendant also read the consent form, said he had no questions, and then signed the form, which indicated that he had signed of his own free will. These circumstances reflect that defendant's "consent" was unequivocal, specific, and intelligent. See United States v. Haynes, 301 F.3d 669, 682 (6th Cir. 2002).

To the extent defendant now claims he did not freely sign the consent form, the record does not reflect any objectively coercive or threatening conduct by the officers. See, e.g., United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996); United States v. Elkins, – F.3d–, 2002 WL 1777790, *6 (6th Cir. 2002). Another factor to consider is a defendant's knowledge of his rights and his past experience with the criminal justice system. See United States v. Crowder, 62 F.3d 782, 788 (6th Cir. 1995); United States v. Elkins, 2002 WL 1777790, *6 (6th Cir. 2002). Dallas Kirby is an adult with significant past experience in the federal criminal justice system. In light of his prior felony conviction, and given that such case involved litigation of search and seizure issues, *see* London Case No. 99-CR-49, the record indicates that Dallas Kirby was familiar with his rights when he signed the consent to search form in the present case. "A defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police in order to invalidate consent." United States v. Elkins, 2002 WL 1777790, *6 (6th Cir. 2002), quoting United States v. Crowder, 62 F.3d 782, 787 (6th Cir.1995). The United States has shown that, under the totality of the circumstances, Dallas Kirby freely and voluntarily consented to the search of his residence.

**Seizure of Pistol from Vehicle**

Finally, Dallas Kirby argues that evidence of the pistol seized from his pick-up truck should be suppressed. Dallas Kirby consented to the search of his residence, and Agent Gray then went to the vehicle in the driveway and looked through the window to procure the VIN number. The scope of Kirby's consent would presumably include the area immediately around the house and any vehicle near the house. Assuming the scope of defendant's consent reasonably included

the vehicle, then a search of such vehicle would be part of the consensual search of the premises and would not violate the Fourth Amendment.

Officers conducting a consensual search may lawfully seize contraband observed in plain view during a search. Horton v. California, 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)("Where the initial intrusion which brings the police within plain view of ... an [incriminating] article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").

Officers may seize contraband in plain-view where: "(1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and (3) the officer has a lawful right of access to the object itself." Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir. 2004)(upholding seizure where agent was lawfully positioned outside of defendant's car and looked through window of vehicle to see firearm protruding from beneath the driver's seat), quoting United States v. Bishop, 338 F.3d 623, 626 (6th Cir. 2003). In Spurgess, 385 F.3d at 928, the Sixth Circuit Court of Appeals explained that "[t]he difference between 'lawfully positioned' and 'lawful right of access' is thus that the former refers to where the officer stands when she sees the item, and the latter to where she must be to retrieve the item," Horton, 496 U.S. at 137 & n. 7.

Officers conducting a consensual search cannot be fairly said to be "unlawfully" at the location where incriminating evidence was viewed. As the search of the premises was authorized by the defendant's consent, the seizure of the pistol was authorized by the "plain-view" doctrine during that search. Horton, 496 U.S. at 142, 110 S.Ct. at 2311; and see, e.g., United States v. Carter, 378 F.3d 584 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 1298 (2005). The defendant voluntarily consented to the search of the residence, and thus, the officers were not "trespassing" at the time the gun was observed in the vehicle and seized.

Independent of whether the scope of consent to search included the motor vehicle, the plain view doctrine is a well-delineated exception to the requirement of a warrant.  Here, the defendant stopped his vehicle on what apparently is a public road (as other residences abut it).  The roadway is not controlled by gates or other devices to keep the public away.  The officers observed the defendant to drive to the property, and he was the sole occupant of the vehicle.  Special Agent Gray had recently been informed that he defendant was a convicted felon (and thus not permitted to possess a firearm).  He also knew that two plots of marijuana had been discovered upon or adjacent to defendant's property.  The officer had a right to look at the vehicle identification number to determine its ownership.  In doing so, the pistol was observed in pain view without any entry into the vehicle.  Under these circumstances, Special Agent Gray had a right to then seize the weapon.  See Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) and United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998).

**IV. Conclusion**

The actions of the officers in flying in a helicopter over defendant's premises in Rockcastle County and in approaching the defendant's residence on foot did not constitute an "unreasonable search". The officers' subsequent eradication of the marijuana plants growing in the open, approximately 35-50 yards from the residence, also did not violate any Fourth Amendment rights of the defendant because defendant has no legitimate expectation of privacy in marijuana growing in an "open field".  The marijuana also appears to have been located beyond the area "immediately" around the residence. The defendant voluntarily consented to a search of the premises, and thus, no warrant was required to search inside the residence or the area immediately around it ("curtilage").  During the consensual search of the premises, the revolver in defendant's vehicle was observed in plain view through the vehicle's window by Agent Gray and could be lawfully seized. The evidence need not be suppressed.

**RECOMMENDATION**

It is **RECOMMENDED** that the "Motion to Suppress Evidence" (DE#17) by the defendant, Dallas Kirby, should be **DENIED**.

By the express agreement of the parties, see DE#26, TR 60, particularized objections to this Report and Recommendation must be filed within five (5) days of the date of service of the same or further appeal is waived. United States v. Walters, 638 F.2d 947 (6th Cir. 1981); Thomas v. Arn, 728 F.2d 813 (6th Cir. 1984), *affirmed*, 474 U.S. 140 (1985). Poorly drafted objections, general objections or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. See Howard v. Secretary of Health and Human Services, 932 F.2d 505 (6th Cir. 1991). Also by agreement, a party may file a response to another party's objection within five (5) days after being served with a copy thereof. Rule 72(b), Fed. R.Civ.P.

This the 27th day of May, 2005.

Signed By:
*J.B. Johnson, Jr.*
United States Magistrate Judge