UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

CRIMINAL ACTION NO. 05-22

UNITED STATES OF AMERICA, PLAINTIFF,

VS. **OPINION AND ORDER**

DALLAS KIRBY, DEFENDANT.

* * * * * * * * *

This matter is before the Court on the Motion to Suppress (Rec. No. 17) of the Defendant, Dallas Kirby ("Kirby"). For the following reasons, the Court DENIES the motion.

**I. FACTS.**

**A. Background.**

On March 9, 2005, Kirby was charged with one count of manufacturing marijuana; one count of possessing marijuana with intent to distribute; and one count of possessing methamphetamine with intent to distribute, all in violation of 21 U.S.C. § 841(a)(1). In addition, Kirby was charged with being a convicted felon in possession of two firearms in violation of 18 U.S.C. § 922(g)(1). (Rec. No. 7, Indictment).

Kirby moved to suppress all evidence seized from his home by police officers arguing that the officers had violated his Fourth Amendment rights by conducting a search without a warrant. (Rec. No. 17). The Magistrate Judge conducted an evidentiary hearing on April 28, 2005 and entered a Report and Recommendation (Rec. No. 31) with proposed findings of fact and conclusions of law. The Magistrate Judge recommended that the Motion to Suppress be denied.

**B. Magistrate Judge's Findings.**

To summarize the factual findings of the Magistrate Judge, on August 19, 2004, law enforcement officers with the Kentucky Governor's Marijuana Eradication Task Force flew in a helicopter over Rockcastle County and observed some marijuana plants growing in a rural area. The officers landed the helicopter in a field across the road from the residence. The officers approached the residence and knocked on the door but no one answered. The officers then proceeded behind the residence toward the suspected marijuana plots going past barrels with fighting chickens attached to them, old junked cars and several dogs tied to doghouses. The officers proceeded to the marijuana plots they had observed from the air, identified 18-19 plants in each plot and began to cut them down.

Kirby later drove up to the residence. One of the officers, Detective John Pratt of the Kentucky State Police, asked Kirby for consent to search the residence. Detective Pratt explained that the officers had found the marijuana. Kirby signed a consent form which indicated that the place to be searched was "Route 4, Box 308, Mount Vernon, Kentucky," which was the address of the residence. During the search of the residence, the officers found methamphetamine powder in two bedrooms, marijuana, a triple beam scale, and a large amount of cash.

While the officers were searching the residence, another officer, Drug Enforcement Administration Special Agent David Gray, went to the truck that Kirby had been driving to identify who it belonged to. When he looked through the truck window, he saw a pistol on the floorboard, partially protruding from underneath the front seat. Agent Gray seized the pistol.

The Magistrate Judge found that the officers did not violate Kirby's rights in flying a helicopter over his premises. The Magistrate Judge further found that the officers' subsequent

eradication of the marijuana plants growing in the open approximately 35-50 yards from the residence did not violate Kirby's Fourth Amendment rights because he had no legitimate expectation of privacy in marijuana growing in an "open field." (Rec. No. 31, Report and Recommendation at 12). The Magistrate Judge found that the marijuana appeared to have been located beyond the area "immediately" around the residence. As to the search of the residence and curtilage after Kirby consented, the Magistrate Judge found that Kirby's consent was voluntary and, therefore, no warrant was required. Finally, as to the revolver in Kirby's vehicle, the Magistrate Judge ruled that it was observed in plain view in the vehicle's window and could be lawfully seized.

**C. Kirby's Objections.**

Kirby filed objections (Rec. No. 34) to the Report and Recommendation. Kirby does not appear to directly object to any of the Magistrate Judge's factual findings. The Court has reviewed *de novo* the record of this matter and, finding the Magistrate Judge's factual findings consistent with the record, accepts those factual findings.

Kirby objects to the Magistrate Judge's legal conclusion that the area in which the marijuana was located was an "open field" and not part of the curtilage of Kirby's residence. The Court will make a *de novo* review of this legal conclusion.

Kirby's objection is based largely on a videotape taken during the search of Kirby's home that the government produced after the evidentiary hearing and was, therefore, not available to the Magistrate Judge. Kirby argues that the videotape shows that the area searched was in close proximity to his house; that Kirby's backyard was clearly delineated by the way the grass was mowed; could not be viewed from the rear without trespassing on Kirby's land behind his backyard; is enclosed on one side by a wire fence; and cannot be viewed from the front because it is obstructed

by the house. Kirby argues that no one "could mistake the yard, and its neatly mowed lawn whereupon pet dogs and sporting/fighting chickens were located from the unkept open fields composing the remaining portion of defendant's rural property." Kirby also argues that the backyard was used to work on old cars and contains houses for the defendant's pets and sporting animals, which Kirby argues are activities related to the intimate activities normally associated with one's home. Kirby argues that his backyard was shielded from view by his home and the terrain and the marijuana was shielded from view by a large overgrowth of weeds.

**D. Factual Findings regarding Location of Marijuana.**

To the extent that Kirby objects to any of the factual findings that formed the basis for Magistrate Judge's conclusion that the marijuana was not located within the curtilage of Kirby's home, the Court has reviewed the videotape and the record, including the transcript of the evidentiary hearing, and makes the following specific factual findings regarding the location of the marijuana.

The officers found two plots of marijuana behind Kirby's residence. The first plot was the plot the officers had observed from the air which was growing around a utility pole. It was located at least 35 yards behind the residence (Rec. No. 26, Pratt, Tr. at 19, 21) but no more than 50 yards behind the residence. (Rec. No. 26, Pratt, Tr. at 9). After identifying that plot, the officers then began looking around and noticed a second plot growing along a fence row which was also located no more than 50 yards behind the residence. (Rec. No. 26, Pratt, Tr. at 9).

Detective Pratt testified that the land was "well cultivated" around the utility pole and that there was nothing that obstructed the view between the house and the pole. He also testified there was four or five feet of foliage in front of the marijuana by the fence row. (Rec. No. 26, Pratt, Tr. at 12).

Detective Pratt testified that he believed the marijuana around the utility pole was within the curtilage of the home because there was a pathway making a boundary on the left and the fence row made a boundary on the right and everything between was "well used, you know, it appeared someone was feeding the animals and, you know, it was being constantly used on a daily basis." (Rec. No. 26, Pratt, Tr. at 32-33).

Mike Walters, a Deputy United Marshall who also took part in the search, testified that walking from the house to the marijuana, there were more chicken barrels and dog kennels and that there was no fence or anything like that. (Rec. No. 26, Walters, Tr. at 44). Nevertheless, Walters did not consider the marijuana plot to be part of the "back yard." (Rec. No. 26, Walters, Tr. at 45). Walters testified that the marijuana around the utility pole was surrounded by high weeds and that he could not see the marijuana until he walked up there. (Rec. No. 26, Walters, Tr. at 48-49).

Agent Gray testified that, when Kirby arrived at the residence, Gray informed him that marijuana had been found growing on his property behind the home. (Rec. No. 29, Gray, Tr. at 4). He said he walked Kirby to the back of the property where the marijuana had been found. He said the grass was mowed all around the power pole except for a 20 x 20' patch that had not been mowed and the marijuana was found in that patch. (Rec. No. 29, Gray, Tr. at 4). He also testified that he marijuana along the fence row was on the other side of the fence opposite of the residence. (Rec. No. 29, Gray, Tr. at 5). Agent Gray testified that it was after he walked Kirby to the marijuana plots that he asked for Kirby's consent to the search.

**II. ANALYSIS.**

The primary legal issue here is whether the marijuana was located within the curtilage of Kirby's home. If it was, then the warrantless search was illegal as there were no exigent

circumstances. If, on the other hand, the marijuana was located in an "open field," then the search did not require a warrant. An individual has no legitimate expectation that open fields, as opposed to the curtilage surrounding a house, will remain free from warrantless intrusion by government officers. *Oliver v. United States*, 466 U.S. 170, 181 (1984).

The extent of the curtilage surrounding a residence is "determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). The central inquiry is whether the area harbors the intimate activity associated with the sanctity of one's home and the privacies of life. *Id.*

The Court in *Dunn* instructed that :

> curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. . . [T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

*Dunn*, 480 U.S. at 301.

**A. Distance Between Marijuana Plots and Residence.**

In *Dunn*, the issue was whether a barn was located within the curtilage of the defendant's home. The Court noted that the barn was located 50 yards away from the fence surrounding the house and 60 yards from the house itself. *Id.* at 302. The Court determined that, standing in isolation, this substantial distance could not support an inference that the barn should be treated as an adjunct of the house. The marijuana at issue here was at least 35 yards from Kirby's house and, at the most 50 yards from the house. Thus, it appears that the marijuana may have been closer to the

house than the barn in *Dunn* but was, nonetheless, a significant distance away from the home. Furthermore, proximity to the home is not alone sufficient to qualify the area for Fourth Amendment protection. *See United States v. French,* 291 F.3d 945, 952 (7th Cir.2002) (stating that privacy expectations are most heightened when the area in question is within 20 feet of the home). Accordingly, this factor is inconclusive.

**B. No Enclosure Surrounded the Marijuana Plots and the Home.**

The *Dunn* Court also noted that the barn did not lie within a fence that surrounded the house. *Id.* at 302. Quoting *Oliver*, the *Dunn* Court stated, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience." *Id*. Here, there were no boundaries such as a fence enclosing the area where the marijuana was growing and the home which clearly marked the area as an extension of Kirby's home.

There was a fence row on one side of the area but the fence did not enclose the area. Moreover, one of the plots of marijuana was growing on the other side of this fence. Most of the area between the house and the marijuana was mowed indicating that the property was indeed used by the occupant of the house. Nevertheless, there was no enclosure encompassing both the house and the area where the marijuana was growing indicating that the area was used for intimate activities associated with the home. Furthermore, the area in which the marijuana was growing was itself covered in an overgrowth of weeds.

**C. Area was not Used for Intimate Domestic Activities.**

The *Dunn* Court found it "especially significant" that the officers had objective data that the

barn was not being used for intimate activities of the home. *Id*. at 302. There, aerial photographs had showed that a truck containing phenylacetic acid, a prescursor to phenylacetone , was backed up the barn. *Id.* at 302. Once on the property, but clearly outside the curtilage, the officers smelled a strong odor of phenylacetic acid. The Court determined that, when considered together, these facts indicated to the officers that the use to which the barn was being put "could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the barn as part of the respondent's home." *Id.* at 303.

Here too the officers had legally viewed marijuana on Kirby's property from the air. Thus, as in *Dunn*, the officers knew prior to entering the area where the marijuana was growing that the area was not used for intimate activities associated with the home. Once on the property, between the residence and the marijuana, the officers observed many "sporting/fighting chickens" tied to barrels. Thus, it became clear that the area was used to maintain fighting chickens. Whether this is an activity that is so associated with the activities and privacies of domestic life that it should be considered an extension of the home need not be addressed. The officers knew prior to entering the area that it was used to grow marijuana and not for an intimate domestic activity and this factor is "especially significant" in determining whether the area was within the home's curtilage.

**D. Kirby Took No Steps to Protect the Area from Observation.**

Finally, in *Dunn* the Court noted that the defendant had done little to protect the barn area from observation by those standing in the open fields. Although there were many interior fences on the defendant's property, the Court determined they were there to corral livestock and not to prevent persons from observing what lay inside the enclosed areas. In *Dunn*, the officers had to climb several fences to get to the barn and then peered inside of the structure to find illegal substances.

Here, again, there was not even a fence, much less a barn, enclosing the area where the marijuana was growing around the utility pole. Moreover, the marijuana plot was not inside any structure. While the marijuana was located behind Kirby's residence and weeds were growing around the marijuana itself, Kirby took no steps to protect the area from observation by anyone standing behind the residence.

**III. CONCLUSION.**

After considering all of the above factors, the Court concludes that the area where the marijuana was growing was not inside the curtilage of Kirby's home. Further, for the reasons detailed by the Magistrate Judge, the Court finds that Kirby voluntarily consented to the search of the residence. Finally, also for the reasons detailed by the Magistrate Judge, the gun in Kirby's truck was observed in plain view by the officers. Accordingly, the Motion to Suppress is hereby DENIED.

In addition to regular service by mail, a copy of this Order shall be transmitted forthwith to counsel of record by facsimile or by electronic filing.

This 3rd day of October, 2005.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY

**Signed By:**
***Karen K. Caldwell*** KKC
**United States District Judge**